## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELAINE WANG, Derivatively on Behalf of Nominal Defendant NEW YORK COMMUNITY BANCORP, INC., | )<br>)<br>) |
| | ) Case No. 1:24-cv-1422 |
| Plaintiff, | )<br>) |
| | ) JURY TRIAL DEMANDED |
| v. | )<br>) |
| THOMAS R. CANGEMI, ALESSANDRO P. DINELLO, JAMES J. CARPENTER, HANIF DAHYA, LESLIE D. DUNN, MARSHALL LUX, LAWRENCE ROSANO, JR., RONALD A. ROSENFELD, LAWRENCE J. SAVARESE, PETER SCHOELS, DAVID L. TREADWELL, ROBERT WANN, JENNIFER R. WHIP, and JOHN J. PINTO, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants, | )<br>) |
| and | )<br>) |
| NEW YORK COMMUNITY BANCORP, INC., | )<br>)<br>) |
| Nominal Defendant. | )<br>) |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Elaine Wang ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant New York Community Bancorp, Inc. ("NYCB" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which

included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding NYCB, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of NYCB against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions from March 1, 2023 through February 5, 2024 (the "Relevant Period") concerning the Company's business and financial condition, as well as the impact of the certain recent acquisitions.

2.      NYCB is one of the largest regional banks in the nation, with positions in businesses including multi-family lending, mortgage originations and servicing, and warehouse lending. Prior to December 2022, NYCB operated as the bank holding company for New York Community Bank, formerly known as Queens County Savings Bank.

3.      On December 1, 2022, NYCB acquired Flagstar Bancorp, Inc., which operated Flagstar Bank N.A (collectively, "Flagstar"). Flagstar operates 395 branches across nine states, particularly in the Northeast and Midwest. The Company also operates nationally through a wholesale network of approximately 3,000 third-party mortgage originators. Following the acquisition, New York Community Bank was merged with and into Flagstar Bank N.A., with Flagstar Bank N.A. continuing as the surviving entity. As a result of the acquisition, NYCB

became among the top 25 banks in the country based on total assets.

4.      On March 20, 2023, NYCB announced that, through Flagstar, it had acquired a substantial amount of the assets of Signature Bridge Bank, N.A. ("Signature Bank"). The Flagstar and Signature Bank acquisitions nearly doubled the Company's total assets from $63 billion to $123.8 billion over the short span of approximately four months. As a result of this growth in total assets to over $100 billion, NYCB became subjected to, among other things, stricter risk-based and leverage capital requirements and liquidity standards as set forth by the Federal Reserve Board ("FRB") as a now 'Category IV" bank.

5.      Throughout the Relevant Period, however, the Company and its top executives repeatedly made materially false and misleading statements about NYCB's business, financial condition and the impact of the Flagstar and Signature Bank acquisitions. When discussing the Signature Bank acquisition, for instance, the Company's top executives misrepresented that it would be immediately accretive to the Company and failed to warn investors of the detrimental impact the acquisition would have on its balance sheet and financial condition. The Individual Defendants failed to disclose that NYCB was required – but failed – to build up capital, strengthen its risk management processes, and reinforce its balance sheet.

6.      On January 31, 2024, NYCB disclosed that it had recorded a $552 million provision for loan losses, up significantly from the $62 million reported just one quarter earlier, and that as a result, the Company had incurred a loss of $252 million, or $0.36 per share, for the quarter. NYCB also disclosed, nearly a year after the Signature Bank acquisition, that it had belatedly adjusted to its new capital and regulatory requirements as a result of the acquisition. The Company further announced that it would cut its quarterly dividend from $0.17 per share to just $0.05 per share.

7.     On this news, the price of NYCB common stock dropped 39%, or $4 per share, to close at $6.47 per share on January 31, 2024.

8.     On February 5, 2024, *Bloomberg* reported that NYCB's chief risk officer and chief audit executive left the Company in the fourth quarter of 2023. The *Bloomberg* report cited "people with direct knowledge of the matter" that the Company's "drastic financial moves…followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency [the "OCC"] …" On this news, the price of NYCB common stock dropped 22%, or $1.20 per share, to close at $4.20 per share on February 6, 2024.

9.     On February 7, 2024, NYCB announced the appointment of Alessandro DiNello ("DiNello"), the former head of Flagstar, as Executive Chairman.

10.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact concerning NYCB's business, financial condition and the impact of the Flagstar and Signature Bank acquisitions. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements that failed to disclose: (a) that the Signature Bank acquisition would not be immediately accretive to the Company because it caused NYCB, as a now Category IV bank, to be forced to comply with materially enhanced prudential standards, including, risk-based and leverage capital requirements, and liquidity standards, and required that NYCB build capital, reinforce its balance sheet and strengthen its risk management processes; (b) that the Company failed to comply with the enhanced prudential standards; (c) that NYCB overstated the quality of its commercial office loan assets; (d) that NYCB was experiencing higher net charge-offs and deterioration in its commercial office portfolio, making it reasonably likely to incur higher loan losses; (e) that NYCB's loan loss provisions were

4

understated; and (f) that the Company failed to have adequate internal risk or disclosure controls and procedures.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     As a result of the foregoing, two securities fraud class actions have been filed against the Company, Chief Executive Officer ("CEO") Thomas R. Cangemi ("Cangemi"), and Chief Financial Officer ("CFO") John J. Pinto ("Pinto") captioned *Lemm, Jr. v. New York Community Bancorp, Inc. et al.*, No. 1:24-cv-00903 (E.D.N.Y.) and *Miskey v. New York Community Bancorp, Inc. et al.*, No. 2:24-cv-01118 (E.D.N.Y.) (together, the "Securities Actions"). The Securities Actions have exposed the Company to massive class-wide liability.

13.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Actions, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

14.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of NYCB's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level

of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the SEC.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant NYCB maintains its principal place of business in this District and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

6

*Plaintiff*

21.     Plaintiff is and has been a continuous shareholder of NYCB common stock since November 2018.

*Nominal Defendant*

22.     Nominal Defendant NYCB is incorporated under the laws of Delaware, with its principal executive offices located in Hicksville, New York. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NYCB."

*Individual Defendants*

23.     Defendant Cangemi has served as President, CEO, and as a director of NYCB since December 2020, and as Chairman of the Company since March 2021. As set forth in the proxy statement filed by NYCB with the SEC on April 11, 2023 (the "2023 Proxy Statement"), Cangemi received $6,280,354 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Cangemi beneficially owned 1,691,927 shares of NYCB's common stock as of April 4, 2023. Defendant Cangemi is named as a defendant in the Securities Actions.

24.     Defendant DiNello has served as a member of the Board since December 2022 following the Flagstar transaction and has served as Executive Chairman of the Board since February 7, 2024. Defendant DiNello previously served as President and CEO of Flagstar since 2013. Defendant DiNello also serves as a member of the Board's Technology Committee, Executive Committee, and Credit Committee. As set forth in the 2023 Proxy Statement, DiNello received $20,833 in compensation from the Company in 2022. According to the 2023 Proxy Statement, DiNello beneficially owned 2,772,361 shares of NYCB's common stock as of April 4, 2023.

25.     Defendant James J. Carpenter ("Carpenter") has served as a member of the Board

7

since December 2022 following the Flagstar transaction. Carpenter previously served as Senior Executive Vice President and Chief Lending Officer of the Company from January 2006, to December 2019. Defendant Carpenter also serves as Chair of the Board's Credit Committee and as a member of the Risk Assessment Committee. According to the 2023 Proxy Statement, Carpenter beneficially owned 681,992 shares of NYCB's common stock as of April 4, 2023.

26.     Defendant Hanif Dahya ("Dahya") has served as a member of the Board since March 2007. Defendant Dahya also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Audit, Compensation, Technology, and Credit Committees. As set forth in the 2023 Proxy Statement, Dahya received $320,630 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Dahya beneficially owned 221,716 shares of NYCB's common stock as of April 4, 2023.

27.     Defendant Leslie D. Dunn ("Dunn") has served as a member of the Board since September 2015. Defendant Dunn also serves as Chair of the Board's Compensation Committee and as a member of the Audit and Nominating and Corporate Governance Committees. As set forth in the 2023 Proxy Statement, Dunn received $272,957 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Dunn beneficially owned 55,118 shares of NYCB's common stock as of April 4, 2023.

28.     Defendant Marshall Lux ("Lux") has served as a member of the Board since February 2022. Defendant Lux also serves as Chair of the Board's Technology Committee and as a member of the Audit and Risk Assessment Committees. As set forth in the 2023 Proxy Statement, Lux received $197,561 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Lux beneficially owned 37,381 shares of NYCB's common stock as of April 4, 2023.

29.     Defendant Lawrence Rosano, Jr. ("Rosano") has served as a member of the Board

8

since July 2014. Defendant Rosano also serves as a member of the Board's Compensation, Credit, and Risk Assessment Committees. As set forth in the 2023 Proxy Statement, Rosano received $249,624 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Rosano beneficially owned 60,618 shares of NYCB's common stock as of April 4, 2023.

30.     Defendant Ronald A. Rosenfeld ("Rosenfeld") has served as a member of the Board since January 2012. Defendant Rosenfeld also serves as a member of the Board's Risk Assessment Committee, Credit Committee, and Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy Statement, Rosenfeld received $235,666 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Rosenfeld beneficially owned 67,585 shares of NYCB's common stock as of April 4, 2023.

31.     Defendant Lawrence J. Savarese ("Savarese") has served as a member of the Board since March 2013. Defendant Savarese also serves as Chair of the Board's Audit Committee and as a member of the Compensation and Nominating and Corporate Governance Committees. As set forth in the 2023 Proxy Statement, Savarese received $262,921 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Savarese beneficially owned 157,898 shares of NYCB's common stock as of April 4, 2023.

32.     Defendant Peter Schoels ("Schoels") has served as a member of the Board since December 2022 following the Flagstar transaction. Defendant Schoels also serves as a member of the Board's Nominating and Corporate Governance Committee and Technology Committee. As set forth in the 2023 Proxy Statement, Schoels received $7,500 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Schoels beneficially owned 46,475 shares of NYCB's common stock as of April 4, 2023.

33.     Defendant David L. Treadwell ("Treadwell") has served as a member of the Board

since December 2022 following the Flagstar transaction. Defendant Treadwell also serves as Chair of the Board's Risk Assessment Committee and as a member of the Audit Committee and Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy Statement, Schoels received $11,042 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Treadwell beneficially owned 158,900 shares of NYCB's common stock as of April 4, 2023.

34. Defendant Robert Wann ("Wann") has served as a member of the Board since January 2008. Defendant Wann also serves as a member of the Board's Technology and Risk Assessment Committees. As set forth in the 2023 Proxy Statement, Wann received $8,125 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Wann beneficially owned 2,256,001 shares of NYCB's common stock as of April 4, 2023.

35. Defendant Jennifer P. Whip ("Whip") has served as a member of the Board since December 2022 following the Flagstar transaction. Defendant Whip also serves as a member of the Board's Audit, Compensation, Risk Assessment, and Credit Committees. As set forth in the 2023 Proxy Statement, Whip received $9,583 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Whip beneficially owned 84,169 shares of NYCB's common stock as of April 4, 2023.

36. Defendant Pinto has served as NYCB's CFO since December 2020 and as Senior Executive Vice President since 2021. As set forth in the 2023 Proxy Statement, Pinto received $2,636,173 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Pino beneficially owned 689,943 shares of NYCB's common stock as of April 4, 2023. Defendant Pinto is named as a defendant in the Securities Actions.

37. Defendants referenced in paragraphs 23 through 36 are herein referred to as the

"Individual Defendants."

38.     The Individual Defendants, together with NYCB, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of NYCB, and because of their ability to control the business and corporate affairs of NYCB, the Individual Defendants owed NYCB and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NYCB in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of NYCB and its shareholders so as to benefit all shareholders equally.

40.     Each director and officer of the Company owes to NYCB and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NYCB, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of NYCB were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of NYCB, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.   As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.   To discharge their duties, the officers and directors of NYCB were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of NYCB were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to NYCB's own Code of Business Conduct and Ethics (the "Code of Conduct"), Code of Professional Conduct, and Corporate Governance Guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how NYCB conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of NYCB and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NYCB's operations would comply with all applicable laws and NYCB's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

13

46.     Each of the Individual Defendants further owed to NYCB and the shareholders the duty of loyalty requiring that each favor NYCB's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of NYCB and were at all times acting within the course and scope of such agency.

48.     Because of their advisory, executive, managerial, and directorial positions with NYCB, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NYCB.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently

14

to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

53.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of NYCB, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of NYCB and at all times acted within the course and scope of such agency.

**NYCB'S CODE OF CONDUCT**

56.     NYCB maintains a Code of Professional Conduct to "establish and promote the highest standards of integrity, accountability, and ethics in the conduct of business among Company personnel and with the Company's customers, its vendors, and the banking industry."

57.     The Code of Professional Conduct warns that violations of the code are of the utmost concern, leading to potential disciplinary actions, such as a demotion, or suspension or termination of employment for cause. In some cases, Company Personnel also may be subject to civil and/or criminal penalties."

58.     In a section titled "Compliance with Laws, Rules, and Regulations, the Code of

Professional Conduct provides:

    A.  Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's policies, including this Code, are built.   All Company Personnel must respect and obey all applicable laws, rules, and regulations (including, without limitation, insider trading laws).   Although not all Company Personnel are expected to know the details of such laws, rules, and regulations, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personal, such as an officer within Human Resources or Legal.

    B.  The Company holds information and training sessions to promote compliance with applicable laws, rules and regulations, including (without limitation) laws and regulations concerning ethics, anti-money laundering, transactions with insiders such as the Federal Reserve's Regulation O, insider trading and other illegal activity.

59.     The Code of Professional Conduct further instructs Company personnel to consult,

among other things, the Company's Restrictions on Public Disclosures Policy and its Securities

Trading Policy.

60.     The Company's Code of Business Conduct and Ethics ("Code of Ethics"), applies

to all directors, the CEO and CFO, and all other senior financial officers of the Company

designated by the CEO.

61.     The Code of Ethics states that directors and senior financial officers shall:

1.  engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

2.  avoid conflicts of interest and disclose to the GC, or such other officer as the Audit Committee5 shall designate to receive such notices (any such officer, the "Corporate Compliance Officer"), all material transactions or relationships that reasonably could be expected to give rise to any such conflict;

3.  take all reasonable measures to prevent unauthorized disclosures of non-public information about the Company that was obtained or created in connection with their activities as Company personnel, unless required by applicable laws or rules or by legal or regulatory process;

16

4. produce full, fair, accurate, timely, and understandable disclosures in the reports that the Company periodically files with, or submits to, the United States Securities and Exchange Commission and in other public communications made by the Company;

5. comply with all applicable governmental laws, rules, and regulations, as well as the rules adopted by any exchange upon which Company-issued securities are listed;

6. promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, or any fraud, whether or not material, that involves management or other employees who have a significant role in financial reporting, disclosures, or internal controls; and

7. promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and to the operation of its business, or a material violation of this Code, by the Company or any agent thereof.

62. The Company's Corporate Governance Guidelines, meanwhile, were adopted "to promote the Company's commitment to best practices in corporate governance."

63. With respect to director responsibilities, the Corporate Governance Guidelines state, in relevant part:

Each Director owes fiduciary duties of loyalty and care to the Company. The duty of loyalty requires Directors to exercise their powers in the interests of the Company and not in the Directors' own interest or in the interest of another person (including a family member) or organization. The duty of care requires that Directors exercise the care that a person in a like position would exercise under the circumstances. In discharging that duty, Directors may rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors.

## NYCB'S AUDIT COMMITTEE CHARTER

64. NYCB's Audit Committee Charter states that the purpose of the Audit Committee is to:

assist the Boards in fulfilling their respective oversight responsibilities, including with respect to review and, as applicable, approval of (1) the integrity of the

17

Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; (3) the qualifications, performance and independence of the Company's Independent Registered Public Accounting Firm (the "Independent Auditor"); (4) the performance of the Company's internal audit function (the "Internal Audit Function"); (5) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time; and (6) to provide the annual report of the Committee to be included in the Company's annual proxy statement.

65.     In outlining the Audit Committee's duties and responsibilities, the Audit Committee Charter states that the Audit Committee must, among other things:

D. <u>Review Financial Statements</u>:

1) Meet with management of the Company and the Independent Auditor to review and discuss the Holding Company's annual audited financial statements and quarterly financial statements and such other related financial statements of the Bank or any of the Company's affiliates as the Committees in its discretion shall deem necessary or appropriate;

2) Review the Holding Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in documents filed with the SEC; and

3) With regard to the Company's financial statements and disclosures, review: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

Notwithstanding the foregoing provisions under this subsection D., the Committees acknowledge that the responsibility for the preparation of the Company's financial statements and disclosures rests with management, and the responsibility for auditing the financial statements and disclosures rests with the Company's Independent Auditor. It is not the duty of the Committees to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and in accordance with Generally Accepted Accounting Principles (GAAP).

66.     With respect to the Audit Committee's duties and responsibilities concerning risk

18

assessment, the Audit Committee Charter provides:

E.  Perform Risk Assessment:

1) Discuss the Company's policies with respect to risk assessment and risk management to ensure that the CEO and senior management of the Company assess and manage the Company's exposure to risk;

2) Discuss guidelines and policies to govern the Company's risk assessment and risk management processes;

3) Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

4) Review and approve the Internal Audit Function's annual audit plans and budgets, directing special attention to specific matters or areas that the Committees, in consultation with the Chief Audit Executive, Independent Auditor, and Chief Corporate Governance Officer, deems to be of special significance.

5) Review with management of the Company, the Independent Auditor, the Chief Audit Executive, and General Counsel the assessment of the adequacy of internal controls required under Section 404 of the Sarbanes Oxley Act of 2002, Section 112 of the Federal Deposit Insurance Corporation Improvement Act of 1991 and applicable Federal Banking Laws (collectively, "Internal Controls Laws"), and review the basis for the reports required to be filed or published by management and the Independent Auditor in connection therewith, as discussed below; and

6) Ensure that management takes necessary steps to maintain an appropriate avenue of communication by and among the Independent Auditor and the Internal Audit Department, the Committees and the Boards with respect to the Company's financial reporting, internal controls, legal and regulatory compliance and other matters addressed in this Charter.

67.     The Audit Committee Charter further requires the Audit Committee to oversee the

maintenance of the Company's internal audit function, stating that the Audit Committee shall:

1) Ensure that the Company maintains an appropriate Internal Audit Function in accordance with the objectives and purposes set forth in this Charter and applicable laws, rules and regulations, including, without limitation, the Corporate Governance Listing Standards of the NYSE;

2) Review the activities, organizational structure, staffing of the Internal Audit Function, and the qualifications of personnel within such Function;

3) Ensure that the Chief Audit Executive maintains organizational independence by reporting functionally to the Committee and administratively to the Chief Executive Officer of the Company;

4) Ensure that the Internal Audit Function provides management of the Company and the Committees with ongoing assessments of the Company's risk management processes and systems of internal control;

5) Ensure that the activities, organizational structure, staffing, and plans of the Internal Audit Function support the effort by management of the Company to perform required evaluations of the Company's internal controls over financial reporting in accordance with the requirements of applicable Internal Controls Laws, all as the Company's senior management and the Independent Auditor may require or deem advisable;

6) Oversee the appointment by the Internal Audit Function of third party service providers other than the Independent Auditor in connection with engagements to perform material functions within the scope of the Internal Audit Function;

7) Approve the Internal Audit Department Charter, annual Internal Audit plan, any material changes thereto, and the Internal Audit staffing and budget; and

8) Annually approve all decisions regarding the performance, evaluation, appointment, or removal of the Chief Audit Executive.

## SUBSTANTIVE ALLEGATIONS

*Background*

68.     In April 2021, NYCB and Flagstar jointly announced that they had entered into a definitive merger agreement under which the two companies would combine in an all-stock merger. The companies jointly announced regulatory approval of the transaction from the OCC in October 2022.

69.     On December 1, 2022, the banks announced the closing of the transaction for approximately $2.6 billion, representing NYCB's largest acquisition to date. Defendant Cangemi stated at the time that the merger "creates a company with significant scale and capabilities with a more diversified loan portfolio, an improved funding mix, and a much better interest-rate risk profile. Our employees will benefit from greater opportunities and resources that a bank with almost $90 billion in assets possesses." In connection with the transaction, NYCB' Board appointed six new directors, five of whom were former directors of Flagstar.

70.     In early March 2023, the New York State Department of Financial Services took possession of Signature Bank "in order to protect depositors" and named the Federal Deposit Insurance Corporation ("FDIC") as receiver. The FDIC in turn transferred all the deposits and nearly all of the assets to Signature Bridge Bank, a full-service bank operated by the FDIC, while it looked for potential bidders for Signature Bank.

71.     On March 19, 2023, NYCB acquired $38.4 billion in assets from Signature Bank, including approximately $13 billion in loans and 40 branches. In a press release issued the day, NYCB highlighted that the transaction "SIGNIFICANTLY ACCELERATES NEW FLAGSTAR BANK'S TRANSFORMATION TO A HIGH-PERFORMING COMMERCIAL BANK." In connection with the transaction, the FDIC received equity appreciation rights to approximately 39 million shares of NYCB common stock.

72.     As a result of the Flagstar and Signature Bank acquisitions, NYCB's total assets exceeded $100 billion, making it a "Category IV" bank by FRB prudential standards. Banks designated as a Category IV are subjected to stricter prudential standards, including risk-based and leverage capital requirements, and liquidity standards.

73.     On May 16, 2023, NYCB issued a press release announcing the pricing of a secondary offering of its common stock by the FDIC, as receiver for Signature Bank (the "Offering"). The shares in the secondary offering were offered and sold pursuant to an automatic shelf registration statement (including a prospectus) filed by the Company with the SEC which became effective upon filing on or about May 16, 2023. The FDIC obtained more than $393 million through the sale of the shares to the public and no longer held any shares of the Company after the sale.

***Materially False and Misleading Statements***

21

74.     On March 1, 2023, at the start of the Relevant Period, NYCB filed its annual report

on Form 10-K with the SEC for the fiscal year 2022 (the "2022 10-K"). The 2022 10-K claimed

that NYCB's asset quality in its commercial lending facility was "strong." Specifically, the 2022

10-K stated, in relevant part:

**Asset Quality**

***Asset quality remained strong during 2022 as increases in NPAs [non performing assets] were substantially due to changes in asset mix related to the Flagstar acquisition*** and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by NPLs and assets acquired in the Flagstar acquisition.

At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

*                    *                    *

***At December 31, 2022, total assets were $90.1 billion***, up $30.6 billion or 51 percent compared to December 31, 2021. ***The growth compared [to] the prior period was primarily due to the Flagstar acquisition which added $25.8 billion of assets***, net of PAA, while the remaining growth was driven by growth in our lending portfolios. [1]

75.     The 2022 10-K further stated that "management [then] believe[d] that the allowance

for losses on loans was appropriate," stating, in relevant part:

**Provision for Credit Losses**

For the twelve months ended December 31, 2022, the provision for credit losses totaled $133 million compared to $3 million for the twelve months ended December 31, 2021. ***The fourth-quarter and full-year provision for credit losses was impacted by the provision for credit losses related to the initial ACL measurement of non-PCD Flagstar acquired loans totaling $117 million***.

*                    *                    *

***Our allowance for credit losses might not be sufficient to cover our actual losses,***

---

[1] All emphases added unless otherwise indicated.

*which would adversely impact our financial condition and results of operations*.

In addition to mitigating credit risk through our underwriting processes, we attempt to mitigate such risk through the establishment of an allowance for credit losses. The process of determining whether or not the allowance is sufficient to cover potential credit losses is based on the current expected credit loss model or CECL. This methodology is described in detail under "Critical Accounting Estimates" in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report. *CECL may result in greater volatility in the level of the ACL, depending on various assumptions and factors used in this model. If the judgments and assumptions we make with regard to the allowance are incorrect, our allowance for losses on such loans might not be sufficient, and an additional provision for credit losses might need to be made*. Depending on the amount of such loan loss provisions, the adverse impact on our earnings could be material. In addition, growth in our loan portfolio may require us to increase the allowance for credit losses on such loans by making additional provisions, which would reduce our net income. Furthermore, bank regulators have the authority to require us to make provisions for credit losses or otherwise recognize loan charge-offs following their periodic review of our loan portfolio, our underwriting procedures, and our allowance for losses on such loans. Any increase in the loan loss allowance or in loan charge-offs as required by such regulatory authorities could have a material adverse effect on our financial condition and results of operations.

*Partially reflecting the net recoveries noted above, and the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022 from $199 million at December 31, 2021. The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the Flagstar acquisition*. The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end.

*Based upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date.*

76.    On March 20, 2023, the Company filed a Current Report on Form 8-K with the SEC attaching a press release announcing the acquisition of Signature Bank assets. The report stated that NYCB subsidiary Flagstar had "acquired certain assets and assumed certain liabilities of [Signature Bank] from the [FDIC]" effective March 19, 2023. The report further noted that the FDIC would receive NYCB stock as consideration at a rate to be determined based on the price

appreciation on NYCB stock on or before March 31, 2023. The transaction was announced as a completed deal not requiring shareholder approval. The press release emphasized that the transaction was "**EXPECTED TO BE SIGNIFICANTLY ACCRETIVE TO BOTH EARNINGS PER SHARE AND TANGIBLE BOOK VALUE**."[2]

77.     The March 20, 2023 press release also stated that "[f]inancially, the deal is expected to be significantly accretive to both earnings per share and to tangible book value per share" and that NYCB's "asset quality metrics remain solid, as they have over multiple business cycles."

78.     On March 23, 2023, the Company filed a Current Report on Form 8-K with the SEC providing an "[u]pdated written presentation distributed and made available to investors, dated March 23, 2023." The presentation included a slide claiming that the transaction "***Significantly Strengthens*** NYCB's Deposit Base and Funding Profile" citing, among other things, that "Deposits increase from $59Bn to $93Bn; significant amount of noninterest bearing deposits." Another slide laid out a specific "Integration Plan" and describing the plan as a "***seamless transition***."

79.     On March 31, 2023, the Company filed a Current Report on Form 8-K with the SEC stating that "in connection with the exercise of the [agreement with] the FDIC Receiver, the Company issued to the FDIC Receiver 39,032,006 shares of the Company's common stock pursuant to the [agreement]." The report also stated that "[t]he Company did not receive any additional proceeds for the shares, which were issued in a private placement conducted pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder."

---

[2] Emphasis in original.

80.     On April 11, 2023, the Company filed the 2023 Proxy Statement with the SEC, inviting investors to its 2023 annual general meeting of shareholders. The 2023 Proxy Statement stated that NYCB had "ended the year with ***total assets of $90 billion***, total loans of $69 billion, and total deposits of $59 billion, ranking the Company as one of the largest regional banks in the country." The 2023 Proxy Statement repeated that "[t]he Signature transaction adds a substantial amount of low-cost deposits and is ***expected to be significantly accretive to both earnings per share and tangible book value per share***."

81.     The 2023 Proxy Statement also highlighted NYCB's "robust" risk management program and "risk governance," stating, in relevant part:

> Our Board Risk Assessment Committee, which meets the requirements for U.S. Bank Holding Companies under the Dodd-Frank Act's Enhanced Prudential Standards, meets at least on a quarterly basis and oversees ***a robust and exacting enterprise risk management program***.
>
> *                *                *
>
> ***Risk Governance*** – Management of risk is important to the success of our operations and business strategies and our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, ***credit, interest rate, liquidity, price, operational, strategic, compliance and reputational risks***."

82.     On April 21, 2023, the Company filed its "Annual Report to Security Holders" on Form ARS with the SEC (the "2023 ARS"). The 2023 ARS represented that NYCB had $90.1 billion in total assets. In a letter addressed to "fellow shareholders" included in the 2023 ARS, Defendant Cangemi stated, in relevant part: "I don't expect a large number of banks to fail this time," noting that the "[r]ecent failures appear to be more idiosyncratic in nature" and that "[t]hey stemmed from each of these banks' specific business models along with substantially high levels of uninsured deposits and ***the lack of an appropriate risk management framework***."

83.     The 2023 ARS also emphasized that "[n]ot only is the [Signature] transaction

expected to immediately and significantly boost our earnings per share and tangible book value per share, but to execute such a transaction during the depths of a crisis, ***speaks volumes of the faith and confidence our regulators have in our management team and business model***."

84.     The 2023 ARS also highlighted NYCB's deposit growth while promising that "[d]espite our growth over the past several months, ***there is one thing we will not outgrow – our conservative underwriting criteria***," that NYCB then had "an enviable track record of historically low levels of losses on our loan portfolio" such that "[a]t the end of last year, our asset quality metrics ***remained among the strongest in the industry***." The 2023 ARS added that "[r]ecently there have been investor concerns about commercial real estate exposure in the banking industry, specifically, exposure to the office sector," yet emphasized that NYCB's "combined office exposure at year-end 2022 was $3.4 billion or approximately 5% of [its] loan portfolio at that time." The 2023 ARS added that "[t]his percentage will decline further with the addition of Signature Bank's loans, none of which were commercial real estate-related."

85.     On April 28, 2023, the Company issued a press release announcing its results for the first quarter 2023. The press release emphasized that the "**SIGNATURE BANK TRANSACTION SIGNIFICANTLY ACCELERATES TRANSITION TO COMMERCIAL BANK TRANSFORMING OUR FUNDING PROFILE AS NON-INTEREST-BEARING DEPOSITS SURGE TO 27% OF TOTAL DEPOSITS**."[3] The press release reported, "Total assets of $123.8 billion compared to $90.1 billion at December 31, 2022, due to the addition of $35.2 billion in assets, net of purchase accounting adjustments ("PAA"), arising from the Signature transaction and organic growth."

---

[3] Emphasis in original.

86.     The press release quoted Defendant Cangemi as stating that NYCB had "successfully navigated the turmoil in the banking industry during the month of March, emerging with the purchase and assumption of certain assets and liabilities of Signature Bridge Bank," and stating that:

> As for the Signature transaction, we believe that this is a game changing deal for us. It builds upon the momentum created by the merger with Flagstar and accelerates our evolution to a diversified, high-performing commercial bank, while jumpstarting our commercial middle market lending business and our relationship banking strategy. It also improves our deposit base and funding mix and further diversifies our loan portfolio. Commercial loans increased to 44% of total loans as the result of an additional $12 billion of loans acquired from Signature, while the amount of noninterest-bearing deposits nearly doubled since year end to $23 billion and now represents nearly one-third of total deposits compared to only 9% before the Flagstar acquisition.
>
> While we have closed two acquisitions over the past four months, **we have remained focused on our fundamentals including asset quality**. Our asset quality metrics remain strong with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. We continue to be laser focused on credit quality across all lending verticals.

87.     The press release further quoted Defendant Cangemi as stating that the Company had "accomplished a lot in a relatively short period of time" and that "[t]he remainder of this year will be devoted to integrating and converting our two acquisitions, reducing expenses, growing our deposit base further, and building out each of our businesses as we transform to the new Flagstar."

88.     The April 28, 2023 press release confirmed that NYCB's "**asset quality metrics and trends remain strong**" and quoted Defendant Pinto as stating, in relevant part:

> While we have closed two acquisitions over the past four months, **we have remained focused on our fundamentals including asset quality. Our asset quality metrics remain strong with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. We continue to be laser focused on credit quality across all lending verticals…**

89.     With respect to "**Allowance for Credit Losses**," the press release stated that "[a]t

27

March 31, 2023, the allowance for credit losses was ***$550 million*** compared to $393 million at December 31, 2022, up $157 million," adding that "[a]pproximately $140 million of the increase was the result of the Signature transaction, including a CECL-related provision of $127 million." The press release also stated that "***net charge-offs were zero during first quarter 2023*** compared to $2 million during first quarter 2022 and $1 million during fourth quarter 2022" and that there had been "[a]n initial provision for credit losses totaling $132 million for the loans acquired from Signature."

90.     On May 10, 2023, the company filed its Quarterly Report on Form 10-Q with the SEC for the first quarter 2023 (the "1Q23 10-Q"). In addition to reporting the same financial results as contained in the April 28, 2023 press release, the 1Q23 10-Q discussed "Regulatory Capital" and stated, in relevant part:

> The Bank is subject to regulation, examination, and supervision by the OCC and the Federal Reserve (the "Regulators"). The Bank is also governed by numerous federal and state laws and regulations, including the FDIC Improvement Act of 1991, which established five categories of capital adequacy ranging from "well capitalized" to "critically undercapitalized." Such classifications are used by the FDIC to determine various matters, including prompt corrective action and each institution's FDIC deposit insurance premium assessments. Capital amounts and classifications are also subject to the Regulators' qualitative judgments about the components of capital and risk weightings, among other factors.

> The quantitative measures established to ensure capital adequacy require that banks maintain minimum amounts and ratios of leverage capital to average assets and of common equity tier 1 capital, tier 1 capital, and total capital to risk-weighted assets (as such measures are defined in the regulations). ***At March 31, 2023, our capital measures continued to exceed the minimum federal requirements for a bank holding company and for a bank***.

91.     With respect to "Asset Quality," the 1Q23 10-Q stated, in relevant part:

> Our asset quality metrics ***remained strong*** during the first quarter of 2023 with increases in NPLs and NPAs attributable to the Signature Transaction. Total NPLs at March 31, 2023 were $161 million, up $20 million or 14 percent compared to December 31, 2022. Total NPAs were $174 million at March 31, 2023, up $21 million or 14 percent compared to December 31, 2022. Repossessed assets of $13

28

million were relatively unchanged compared to the $12 million recorded in the prior quarter.

At March 31, 2023, NPAs to total assets equaled 14 basis points compared to 17 basis points at December 31, 2022 while NPLs to total loans equaled 20 basis points compared to 20 basis points at December 31, 2022.

92.     The 1Q23 10-Q reassured investors that the allowance for loan losses remained

adequate, stating, in relevant part:

> *Historically, our level of net charge-offs has been relatively low in downward credit cycles, even when the volume of non-performing loans has increased*. For the three months ended March 31, 2023, our net charge-offs were zero as compared to net charge-offs of $2 million over the same period in 2022.
>
> *The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022*. The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.
>
> *Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date*.

93.     On May 18, 2023, the Company filed its final Prospectus with the SEC on Form

424B7 to register the approximately 39 million shares of Company stock sold by the FDIC in

connection with the Signature Bank transaction. The Prospectus acknowledged that "*[a]s of March

31, 2023, the Company had $123.7 billion of total assets*, $82.5 billion of total loans and leases,

total deposits of $84.8 billion, and total stockholders' equity of $10.8 billion." In exchange for the

shares, the FDIC immediately received $392,378,998 and ceased any ownership interest in NYCB.

94.     With respect to certain risks and challenges associated with the transaction, the

Prospectus listed "the ability to successfully integrate branches and operations *and to implement

appropriate internal controls and regulatory functions relating to such activities*." This was

framed as a mere potential risk, rather than as a then present fact. The Prospectus also incorporated by reference the 2022 10-K and the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2023, "for a discussion of certain risks related to NYCB's business and the Signature transaction."

95.     On July 27, 2023, NYCB issued a press release announcing its second quarter 2023 financial results. The press release emphasized that: "CAPITAL RATIOS TREND HIGHER." The press release reported that, for the quarter, "net income and diluted EPS were impacted by a *bargain purchase gain* of $141 million arising from the Signature transaction." The press release further reported that "[a]t June 30, 2023 *total assets were $118.8 billion* compared to $123.7 billion at March 31, 2023 and $90.1 billion at December 31, 2022." Defendant Cangemi was quoted in the press release as stating:

> We also reported very positive balance sheet trends. Our funding composition continues to improve as core deposits have increased over the past quarter, while our reliance on wholesale borrowings has declined. Total deposits increased $3.7 billion or 17% annualized on a linked-quarter basis to $88.5 billion, as the increase in noninterest-bearing deposits more than offset the decline in other categories including CDs and deposits related to loan portfolios we did not acquire from Signature. Noninterest-bearing deposits now represent 29% of total deposits.
>
> At the same time, wholesale borrowings declined 24% or $4.9 billion during the current quarter, as we used some of the cash from the Signature transaction to reduce the level of FHLB-NY borrowings. On the lending front, total loans were up modestly despite the higher interest rate environment and is reflective of our diversification efforts, as growth in the commercial portfolio offset declines in other lending verticals. Commercial loans represented 44% of total loans at quarter end.
>
> ***Our asset quality remains strong. Our overall metrics are still among the best in the industry***, with NPAs at a mere 21 basis points of total assets, even though we had an uptick in non-performing loans. Additionally, we had a net recovery of $1 million during the quarter."

96.     The press release also reassured investors that NYCB's "***asset quality trends remain among the best in the industry***, despite the slightly higher NPLs," and that "[a]t June 30,

30

2023, the allowance for credit losses was **$594 million** compared to $550 million at March 31, 2023, up $44 million."

97.   In a discussion on "Allowance for Credit Losses," the press release stated that "[a]t June 30, 2023, the allowance for credit losses was $594 million compared to $550 million at March 31, 2023, up $44 million" and that the "allowance for credit losses to total loans held for investment increased to 71 basis points at June 30, 2023 compared to 67 basis points at March 31, 2023."

98.   On August 9, 2023, the Company filed its Quarterly Report for the second quarter 2023 on Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q discussed "Regulatory Capital," and stated, in relevant part:

> The Bank is subject to regulation, examination, and supervision by the OCC and the Federal Reserve (the "Regulators"). The Bank is also governed by numerous federal and state laws and regulations, including the FDIC Improvement Act of 1991, which established five categories of capital adequacy ranging from "well capitalized" to "critically undercapitalized." Such classifications are used by the FDIC to determine various matters, including prompt corrective action and each institution's FDIC deposit insurance premium assessments. Capital amounts and classifications are also subject to the Regulators' qualitative judgments about the components of capital and risk weightings, among other factors.

> The quantitative measures established to ensure capital adequacy require that banks maintain minimum amounts and ratios of leverage capital to average assets and of common equity tier 1 capital, tier 1 capital, and total capital to risk-weighted assets (as such measures are defined in the regulations). At June 30, 2023, our capital measures continued to exceed the minimum federal requirements for a bank holding company and for a bank.

99.   With respect to "Asset Quality," the 2Q23 10-Q provided, in relevant part:

> ***Our asset quality metrics remained strong during the second quarter of 2023*** despite increases in NPLs and NPAs attributable to certain loans acquired in the Signature Transaction and Flagstar acquisition. At June 30, 2023, NPAs to total assets equaled 0.21 percent compared to 0.14 percent at March 31, 2023 while NPLs to total loans equaled 0.28 percent compared to 0.20 percent at December 31, 2022. Repossessed assets of $13 million were relatively unchanged compared to the $13 million recorded in the prior quarter.

100.   The 2Q23 10-Q also stated, in relevant part:

At June 30, 2023, **total assets were $118.8 billion**, up $28.7 billion compared to December 31, 2022. Total deposits were $88.5 billion at June 30, 2023, up $29.8 billion from December 31, 2022. **These year-to-date increases were primarily due to our March 20, 2023, assumption of a substantial amount of the deposits and certain identified liabilities and the acquisition of certain assets and lines of business of Signature Bridge Bank, from the FDIC, as receiver for Signature Bridge Bank (the "Signature Transaction").**

\*               \*               \*

**The allowance for credit losses on loans and leases increased $201 million, equaling $594 million at June 30, 2023 from $393 million at December 31, 2022. The increase was primarily related to the initial allowance for credit losses of $132 million for the acquired loans in the Signature Transaction**, an increase of $13 million in specific reserves primarily related to two loans that have moved to nonaccrual and an increase of $56 million primarily related to our worsening forecast of macroeconomic conditions and origination volume since year-end. The allowance for credit losses on loans and leases represented 255 percent of nonperforming loans at June 30, 2023, as compared to 279 percent at the prior year-end.

**Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date**.

101.    On October 26, 2023, the Company issued a press release announcing its third quarter 2023 financial results for the interim period ended September 30, 2023. The press release emphasized that "FUNDING COMPOSITION CONTINUES TO IMPROVE AS WHOLESALE BORROWINGS AND BROKERED DEPOSITS CONTINUE TO DECLINE." The press release reported that "[a]t September 30, 2023 **total assets were $111.2 billion** compared to $118.8 billion at June 30, 2023 and $90.1 billion at December 31, 2022" and that the "linked-quarter decrease was primarily driven by lower balances of cash and cash equivalents." Further, the press release stated that "**[f]or the three months ended September 30, 2023, the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023**."

102.    The press release also stated that NYCB's "nine-month net income and diluted EPS

include a ***bargain purchase gain*** of $2.1 billion arising from the Signature transaction," and that

"[t]he allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-

performing loans and 0.74% of total loans." Defendant Cangemi was quoted in the press release

as stating:

> On the asset quality front, while we experienced a significant decline in early-stage
> delinquencies compared to the previous quarter, non-performing loans increased on
> a linked-quarter basis, owing primarily to two commercial real estate loans in the
> office sector. ***Despite this, our asset quality metrics continue to be among the best
> in the industry*** with non-performing loans at 47 basis points of total loans and net
> charge-offs of only three basis points. This reflects our conservative underwriting
> practices.

103.    The same day, NYCB filed its Investor Presentation slides for the third quarter 2023

with the SEC. the presentation emphasized NYCB's "Solid balance sheet" and that "Total assets

of ***$111.2 billion*** declined $7.6 billion compared to June 30, 2023, primarily due to lower cash

balances resulting from a decrease in FDIC custodial deposits." The presentation failed to explain

that the Company was subject to enhanced scrutiny and reporting requirements. The presentation

also emphasized NYCB's then "Strong capital and disciplined credit," stating NYCB "remain[ed]

well capitalized ***and well above the minimum thresholds for all applicable capital ratios***" and

that "NPLs/Total Loans was 0.47%" and "Net charge-offs of $24 million."

104.    Concerning "Credit Quality," the presentation emphasized that NYCB's "current

and historical net charge-offs demonstrate non-performing loans result in low levels of actual

losses." As to "Regulatory Capital," the presentation stated that the Company "remain[s] well

capitalized and well above the minimum thresholds for all applicable ratios." The presentation also

disclosed that the Company "[c]ontinue[d] to perform enhanced monitoring on the portfolio" and

described "[t]wo nonperforming loans totaling $124 million and net chargeoffs of $14 million."

105.    On November 9, 2023, the Company filed its Quarterly Report for the third quarter

2023 on Form 10-Q with the SEC (the "3Q23 10-Q"). In addition to providing the same financial

results as reported in the October 26, 2023 press release, the 3Q23 10-Q discussed "Regulatory

Capital" and stated, in relevant part:

> The Bank is subject to regulation, examination, and supervision by the OCC and the Federal Reserve (the "Regulators"). The Bank is also governed by numerous federal and state laws and regulations, including the FDIC Improvement Act of 1991, which established five categories of capital adequacy ranging from "well capitalized" to "critically undercapitalized." Such classifications are used by the FDIC to determine various matters, including prompt corrective action and each institution's FDIC deposit insurance premium assessments. Capital amounts and classifications are also subject to the Regulators' qualitative judgments about the components of capital and risk weightings, among other factors.

> The quantitative measures established to ensure capital adequacy require that banks maintain minimum amounts and ratios of leverage capital to average assets and of common equity tier 1 capital, tier 1 capital, and total capital to risk-weighted assets (as such measures are defined in the regulations). ***At September 30, 2023, our capital measures continued to exceed the minimum federal requirements for a bank holding company and for a bank.***

106.    With respect to "Asset Quality," the 3Q23 10-Q stated, in relevant part:

> At September 30, 2023, NPA to total assets equaled 0.40 percent compared to 0.21 percent at June 30, 2023 while NPL to total loans equaled 0.52 percent compared to 0.28 percent at June 30, 2023. The increase in NPLs were primarily related to two commercial real estate loans in the office sector that added $139 million in the third quarter of 2023 and multi-family increased $91 million of which the largest individual loan was $42 million. Repossessed assets of $12 million were slightly lower compared to $13 million in the prior quarter.

107.    The 3Q23 10-Q also discussed the Company's loan loss provisions, providing, in

relevant part:

> **Provision for Credit Losses**

> *Comparison to Prior Quarter*

> The three months ended September 30, 2023 the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023.

> ***During the third quarter 2023, we incorporated the commercial loans and***

***unfunded commitments acquired in the Signature Transaction in the Company's allowance for credit loss models which resulted in a net provision benefit of $13 million***. The $75 million provision on the remainder of the portfolio was driven by increases to our estimated loan loss and unfunded commitment reserves as a result of changes in the macroeconomic environment, specifically the inflationary pressures leading to sharp increases in interest rates and a slow-down of prepayment activity leading to longer weighted average lives on the balance sheet. In addition, the increase reflects unfavorable market conditions in the CRE portfolio (primarily office). During the quarter we had net charge-offs totaling $24 million.

The second quarter 2023 provision of $49 million included increases of $13 million related to specific reserves for new non-accrual loans and the remainder was driven by changes in the macroeconomic forecast.

*          *          *

***We continue to monitor our loans held for investment portfolio and the related allowance for credit losses***, particularly given the economic pressures facing the commercial real estate and multi-family markets. While our multi-family lending niche has not been immune to downturns in the credit cycle, ***the limited number of losses we have recorded, even in adverse credit cycles, suggests that the multifamily loans we produce involve less credit risk than certain other types of loans. In general, buildings that are subject to rent regulation have historically tended to be stable, with occupancy levels remaining more or less constant over time***. Because the rents are typically below market and the buildings securing our loans are generally maintained in good condition, they have been more likely to retain their tenants in adverse economic times. In addition, we generally exclude any short-term property tax exemptions and abatement benefits the property owners receive when we underwrite our multi-family loans.

108.    The statements identified above were materially false and misleading when made and failed to disclose adverse facts. Specifically, the statements detailed above failed to disclose: (a) that the Signature Bank acquisition would not be immediately accretive to the Company because it caused NYCB, as a now Category IV bank, to be required to comply with materially enhanced prudential standards, including, risk-based and leverage capital requirements, and liquidity standards, and required that NYCB build capital, reinforce its balance sheet and strengthen its risk management processes; (b) that NYCB failed to comply with the enhanced prudential standards; (c) that NYCB overstated the quality of its commercial office loan assets; (d)

35

that NYCB was experiencing higher net charge-offs and deterioration in its commercial office portfolio, making it reasonably likely to incur higher loan losses; (e) that NYCB's loan loss provisions were understated; (f) that the Company failed to have adequate internal risk or disclosure controls and procedures; and (g) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

***The Truth Emerges***

109.    On January 31, 2024, the Company issued a press release announcing its fourth quarter and fiscal year 2023 financial results. NYCB disclosed that it had recorded a $552 million provision for loan losses, up significantly from the $62 million reported just one quarter earlier, and that as a result, the Company incurred a loss of $252 million, or $0.36 per share, for the quarter. The press release explained that the larger provision for loan losses was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio. With respect to credit losses, the press release stated that "[a]t December 31, 2023, the allowance for credit losses was $992 million compared to $619 million at September 30, 2023, up $373 million reflecting our actions to build reserves during the quarter to address weakness in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets, which better aligns the Company with its relevant bank peers, including Category IV banks."

110.    The press release further stated:

For the three months ended December 31, 2023, the provision for credit losses totaled $552 million compared to a $62 million provision for the three months ended September 30, 2023. ***The increase is primarily attributable to higher net charge-offs***, as well as, to address weakness in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets.

*               *               *

36

*Fourth quarter net charge-offs were primarily related to two loans.* First, we had one co-op loan with a unique feature that pre-funded capital expenditures. Although the borrower was not in default, the loan was transferred to held for sale during the fourth quarter. We expect the loan to be sold during the first quarter of 2024. We also performed a review of other co-op loans and did not find any other loans with similar characteristics.

Second, we had an additional charge-off on an office loan that went non-accrual during the third quarter, based on an updated valuation. Given the impact of recent credit deterioration within the office portfolio, we determined it prudent to increase the ACL coverage ratio.

*Together, these two loans accounted for the bulk of the $185 million of net charge-offs we took during the fourth quarter.*

111.    NYCB further disclosed that it was just then adjusting to the demands of being a large bank as a result of its purchase of assets and liabilities from Signature Bank. The press release stated that the Company's assets under management had surpassed $100 billion, thereby "subjecting [it] to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards" and more, and that as a result, it had "[taken] decisive actions to build capital, reinforce our balance sheet, strengthen [its] risk management processes, and better align [itself] with the relevant bank peers."

112.    The Company also disclosed that it was cutting its quarterly dividend from $0.17 to just $0.05 per share.

113.    On this news, the price of NYCB common stock dropped 39%, or $4 per share, to close at $6.47 per share on January 31, 2024.

114.    On February 5, 2024, *Bloomberg* published a report citing "people with direct knowledge of the matter," that "mounting pressure from a top US watchdog" led to NYCB's "surprise decision to slash its dividend and stockpile cash in case commercial real estate loans [went] bad." *Bloomberg* further reported that "[a]s of late last year, the company's website no longer showed chief risk officer Nicholas Munson and chief audit executive Meagan Belfinger on

its leadership page" and that the "changes weren't publicly reported by the firm at the time."

115.    In response to this news, the price of NYCB common stock dropped 22%, or $1.20 per share, to close at $4.20 per share on February 6, 2024.

***Harm to the Company***

116.    As a direct and proximate result of the Individual Defendants' misconduct, NYCB has lost and expended, and will lose and expend, millions of dollars.

117.    Such expenditures include, but are not limited to, legal fees associated with the Securities Actions filed against the Company, its CEO, and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

119.    Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

120.    As a direct and proximate result of the Individual Defendants' conduct, NYCB has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

<u>**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**</u>

121.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties by the Individual Defendants.

122.    NYCB is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

123.    Plaintiff is an owner of NYCB common stock and has been a continuous shareholder of Company stock since November 2018.

124.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

125.    A pre-suit demand on the Board of NYCB is futile and, therefore, excused. At the time this action was commenced, the thirteen-member Board consisted of Individual Defendants DiNello, Cangemi, Carpenter, Dahya, Dunn, Lux, Rosano, Rosenfeld, Savarese, Schoels, Treadwell, Wann, and Whip (the "Director Defendants"). As set forth below, all thirteen Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

126.    The acts complained of herein constitute violations of fiduciary duties owed by NYCB's officers and directors, and these acts are incapable of ratification.

127.    As members of the Board, the Director Defendants were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv)

ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

128.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

129.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

130.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

131.    According to the 2023 Proxy Statement, Director Defendants Cangemi, DiNello, Carpenter, and Wann are not independent. As such, these Director Defendants cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, because that would expose them to liability and threaten their livelihood and, thus, demand is futile as to each of them.

132.    All thirteen of the Director Defendants signed the 2022 10-K, while Director Defendant Cangemi also provided certification in accordance with the Sarbanes-Oxley Act of 2002. Director Defendant Cangemi also signed the 1Q23 10-Q, 2Q23 10-Q, and 3Q23 10-Q, and

provided certification in accordance with the Sarbanes-Oxley Act of 2002 as to each. Accordingly, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

133.    Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

134.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

135.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

136.    Defendants Savarese, Dahya, Dunn, Lux, Treadwell, and Whip (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the

Company, as that would expose them to substantial liability and threaten their livelihoods.

137.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

138.    Additionally, Director Defendant Cangemi faces significant personal liability as a defendant in each of the Securities Actions and, therefore, is unable to comply with his fiduciary duties and prosecute this action and therefore demand upon him is futile.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

143.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of NYCB were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

144.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of NYCB, their control over, and/or receipt and/or modification of NYCB's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning NYCB, participated in the fraudulent scheme alleged herein.

145.    As a result of the foregoing, the market price of NYCB common stock was artificially inflated. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of NYCB common stock in purchasing NYCB common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

146.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the

Securities Actions and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Actions.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

149.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

150.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

151.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent

44

business judgment to protect and promote the Company's corporate interests.

152.   Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, among other things: (a) that the Signature Bank acquisition would not be immediately accretive to the Company because it caused NYCB, as a now Category IV bank, to comply with materially enhanced prudential standards, including, risk-based and leverage capital requirements, and liquidity standards, and required that NYCB build capital, reinforce its balance sheet and strengthen its risk management processes; (b) that NYCB failed to comply with the enhanced prudential standards; (c) that NYCB overstated the quality of its commercial office loan assets; (d) that NYCB was experiencing higher net charge-offs and deterioration in its commercial office portfolio, making it reasonably likely to incur higher loan losses; (e) that NYCB's loan loss provisions were understated; (f) that the Company failed to have adequate internal risk or disclosure controls and procedures; and (g) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

153.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

154.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

155.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

156.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

157.     Plaintiff, on behalf of NYCB, has no adequate remedy at law.

## COUNT III

**Against The Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

158.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

160.     Plaintiff on behalf of NYCB has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Unjust Enrichment

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NYCB.

163.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from NYCB that was tied to the performance or artificially inflated valuation of NYCB or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

164.    Plaintiff, as a shareholder and a representative of NYCB, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

165.    Plaintiff, on behalf of NYCB, has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by

allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

168.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Actions.

169.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

170.    Plaintiff, on behalf NYCB, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of NYCB and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing NYCB to take all necessary actions to reform and improve its corporate governance and internal procedures to protect NYCB and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into

the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: February 26, 2024                          **RIGRODSKY LAW, P.A.**

                                         By:   */s/ Timothy J. MacFall*
                                               Seth D. Rigrodsky
                                               Timothy J. MacFall
                                               Gina M. Serra
                                               Vincent A. Licata
Of Counsel:                                    825 East Gate Boulevard, Suite 300
                                               Garden City, NY 11530
**MELWANI & CHAN LLP**                         Telephone: (516) 683-3516
Gloria Melwani                                 Email: sdr@rl-legal.com
1180 Avenue of the Americas, 8th               Email: tjm@rl-legal.com
Floor New York, NY 10036                       Email: gms@rl-legal.com
(212) 382-4620                                 Email: vl@rl-legal.com

                                               *Attorneys for Plaintiff*